IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 21, 2025

## STATE OF TENNESSEE v. CARLOS MONALITO CLARK

**Appeal from the Criminal Court for Davidson County**
**No. 2022-C-1735    Jennifer Smith, Judge**

_____

### No. M2025-00435-CCA-R3-CD
_____

The Defendant, Carlos Monalito Clark, a career offender, was indicted for aggravated burglary, a Class C felony, and vandalism under $1000, a Class A misdemeanor. Pursuant to a plea agreement, the Defendant entered a guilty plea to aggravated burglary and received a Range III sentence of ten years with the manner of service to be determined by the trial court. The vandalism charge was dismissed pursuant to the plea agreement. Following a hearing, the trial court ordered the Defendant to serve his sentence in confinement. In this appeal, the Defendant argues he is entitled to de novo review or a new sentencing hearing because the trial court failed to consider three statutory sentencing factors, failed to consider the purposes and principles of the sentencing act, and failed to consider his request for community corrections. Upon review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and STEVEN W. SWORD, JJ., joined.

Ellison Berryhill, Nashville, Tennessee (on appeal); Jessica Pursell, Nashville, Tennessee (at trial), for the appellant, Carlos Monalito Clark.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Glenn Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On December 11, 2024, the Defendant entered a guilty plea to the offense of aggravated burglary which was supported by the following factual basis:

In case 2022-C-1735, the State of Tennessee versus Carlos Clark, the State's proof would have been that on [April 12, 2022], at approximately 7:49 a.m., officers were dispatched to [] Andrew Jackson Way here in Davidson County in regards to a shooting. Upon arrival, they located [the Defendant] inside the home at [] Andrew Jackson Way, which was not his home. It was actually the victim['s] apartment. They found [the Defendant] who had suffered multiple gunshot wounds. He was transported to Vanderbilt Hospital in critical condition. Officers spoke with [the victim] who lived in that apartment, who stated that he and his son were asleep in the bedroom. They had woken up and heard a loud bang and thought it could have been thunder or neighbors, but then heard glass break. So [] the victim, then grabbed his .40 caliber handgun, went outside of his bedroom and immediately observed [the Defendant] and fired multiple shots out of fear for him and his son. They then exited out the bedroom window and called 911. Officers observed a sliding glass door that had been slightly opened and appeared to be the entry point and also located footprints on the front door as if someone had tried to kick it in as well as a broken bedroom window. That would be the State's proof in this case.

In exchange for his guilty plea, the State agreed to allow the Defendant, a career offender, to be sentenced as a Range III offender and to receive a 10-year sentence to be served with 45% release eligibility. The record shows, and the Defendant did not dispute, that the Defendant qualified as a career offender based on Tennessee Code Annotated section 40-35-108(a)(1), which provides that "[a] career offender is a defendant who has received [a]ny combination of six (6) or more Class A, B, or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony[.]" Notably, a defendant sentenced as a career offender must receive the maximum sentence within Range III, and their release eligibility date is increased to 60%. See Comments to Tenn. Code Ann. § 40-35-108 (citing Tenn. Code Ann. §40-35-501(f)). A Range III sentence for a Class C felony of aggravated burglary is not less than ten (10) nor more than fifteen (15) years. See Tenn. Code Ann. §40-35-112(c)(3). The State also agreed to dismiss count two of the indictment, charging vandalism under $1,000, and for the instant conviction to be served concurrently with a "past conviction." The manner of service of the Defendant's sentence was to be determined by the trial court after a hearing.

On February 28, 2025, the trial court conducted a sentencing hearing, during which Melody Saxon, Tierra Mayhorn, Nikki Turner, and the Defendant testified. The

- 2 -

Defendant's presence report was admitted into evidence. The State amended the presence report with (1) a certified copy of the affidavit from the Defendant's Sumner County theft of property conviction, noting May 20, 2021, as the correct offense date; (2) a July 26, 2023 court order showing the Defendant entered a guilty plea to the Sumner County theft conviction, ordering the Defendant to serve time in jail, and placing him on supervised probation with conditions to attend and complete an "IOP" at Park Center, attend and complete a "theft" class, and to cooperate with medical professionals at Center Stone; and (3) a December 15, 2023 affidavit in support of the Defendant's violation of probation for the Sumner County theft conviction, noting that the Defendant had failed to report to the probation office as directed, failed to attend or enroll in the required theft class, and failed to complete the Park Center IOP.

The presence report showed that the Defendant, age 53, was not married and had a "close knit" family. He obtained his GED in 1992 and had no verified work history. For his version of the circumstances of the offense, the Defendant provided the following statement:

> For the current offense I'm vague on memory of what led up to me being shot and reasons exactly why I was even there. I do know that I was under the influence of cocaine and that I really don't know why I was there, agg[ravated] burglary or burglary is not what I do. I take responsibility for even being around any type of situation that would [jeopardize] myself or a child or anyone else especially when a firearm is involved. I don't have a weapon charge and that is just not the type of crime that I did. I apologize to the victims and I'm grateful that God has allowed me to remain on this earth. I see and view life in different ways that are better and productive for me and it started with therapy with drugs and mental health. I am not perfect however and I know that if I relapse, I don't give up I get back up and continue.

The presence report provided the Defendant's criminal history, which spanned over three decades, from 1989 to 2023. It included 14 felony convictions listed in the State's notice of enhancement, namely convictions for theft of property, aggravated assault, burglary of a motor vehicle, attempted burglary other than a habitation, and sale of a controlled substance. The report also reflected approximately 78 misdemeanor convictions for assault, theft, driving while impaired and other driving related offenses, possession of drugs and drug paraphernalia, evading arrest, criminal trespass, criminal impersonation and identity theft, resisting arrest, attempt to tamper with evidence, and passing worthless checks. The report included approximately 39 charges against the Defendant that had been dismissed or retired. Finally, the report noted that on August 16, 2024, the Defendant

incurred a disciplinary infraction of "false report/allegation, disruptive behavior, and theft," for which the Defendant received five days' lockdown.

Within the report, the Defendant self-reported the use of alcohol daily since he was 12 years old, the use of cocaine daily since he was 16 years old, and the use of marijuana one to five times a week since he was 12 years old. He further reported that he completed substance abuse treatment at Buffalo Valley from September 2023 to October 2023, and that he completed the New Avenues substance abuse program in November 2024. He had received mental health treatment from Centerstone in 2023, and he had been diagnosed with anxiety, depression, and PTSD, for which he was taking Zoloft, Prazosin, and Trileptal as prescribed. The presentence report included a risk and needs assessment, which recommended a highly structured, non-residential treatment plan should the court order supervision rather than confinement. The Strong-R assessment noted the Defendant's risk level as "HVPD" and his needs as "HIGH[.]"

Detective Melody Saxon of the Metro Nashville Police Department's nonlethal shooting unit testified that the homeowner and his two-year-old son, the victims in this case, were in their car outside of their apartment once law enforcement arrived on the scene. The Defendant was inside the apartment on the living room floor with multiple gunshot wounds to his body. The Defendant was transported to the hospital, and the detective was unable to speak with him for over a month. The adult victim cooperated with law enforcement, provided them with his firearm, and had no criminal history. The victim did not know the Defendant, and the Defendant was not a tenant on the property. In describing the scene, the detective stated that it appeared as if "someone tried to kick open the front door" because there was a shoe print on it. The child's bedroom window was also broken, and there was glass that led into the living room. Ten spent cartridge casings were recovered from the scene; there was no indication the Defendant shot back at the victim, and no other firearms were recovered from the scene.

On cross-examination, the detective was questioned about the Defendant's medical condition. Although she called the hospital for status updates and knew that he had "a few" surgeries, she did not speculate further regarding his medical condition. A month after the offense, she was advised that the Defendant was "up walking around" and his warrant status was changed from inactive to active. Other than an open refrigerator, various open cabinet doors, and broken glass, there were no visible signs of disarray or damage in the apartment.

Tierra Mayhorn, a dual disorder program specialist, testified that she assessed the Defendant for the Dual Disorder Service (DDS) program when he was in jail. The Defendant was accepted into the DDS program and required to abide by certain special conditions, including completion of the Buffalo Valley residential treatment program.

- 4 -

Nikki Turner, a manager at Tracking Solutions, testified that she was familiar with the Defendant and that her office had installed a GPS monitor on the Defendant from October 2023 to January 2024. She stated that the Defendant complied with monitoring requirements, paid all fees, kept his device charged, and completed the program. On cross-examination, Turner agreed that the Defendant's order to wear an ankle monitor stemmed from a probation violation.

The Defendant, age 53, testified and apologized to the victim and his son. The Defendant stated, "I take responsibility for it. I wish it would never have happened because it scarred [sic] and wounded them as well as it did me." Although he could not remember breaking into the victims' apartment, the Defendant explained the events leading up to the offense. He had been at a hotel room with his girlfriend using cocaine, and at that time, he had been using two to three grams to a quarter an ounce of cocaine daily. He next remembered getting a ride to the store, and then he may have "passed out[.]" He woke up "in this situation[,]" and he vaguely remembered being taken to the hospital. When he woke up, he was on a ventilator and had multiple gunshot wounds. He had a cast on his foot and hand, and his chest was "wide open." He had been shot in the jaw and shoulder, and he had a total of nine gunshot wounds. He identified a photograph of "a big old scar" where the bullets were removed from his stomach.

Upon being shown a "packet of information," the Defendant said, "I don't know what this is. Surgeries. This is on the surgery discharge. Active problems." The Defendant stated that the packet contained records from his hospitalization. He was asked to read "a few things listed under diagnosis" and stated:

> Active [principal] problems, gunshot wounds. Active problems, a mandible fracture, injury of right vertebrae, a scapula fracture, a left ureteral injury, a tibia fracture, a liver laceration, a thumb fracture, calcaneus fracture, talar fracture, a cervical transverse process, injury of primary branch superior mesenteric artery, small bowel laceration, acute pain due to trauma.

After reciting the above section, the packet of information was admitted into evidence as an exhibit. The Defendant continued to explain that he had ongoing medical issues from his injuries. He said he was "changed forever," "disfigured," had "limited mobility and function," and was in constant pain. His ability to speak had changed because he had "half a tongue" and it was difficult to pronounce certain words, swallow, and chew. He walked with a cane and had been diagnosed with "PTSD, depression, [and] anxiety." Finally, the Defendant discussed his drug addiction and history of substance abuse. He acknowledged that he previously had been given opportunities to seek treatment and that at that time he did not "want it" or was not ready.

The Defendant acknowledged that he had "a number of criminal convictions," that he was first arrested when he was 18 years old, and that he previously had been to prison. He was on probation for another case when the instant offense occurred, and he agreed that he had a relapse. He explained that his girlfriend passed away and that it had a significant impact on him. He acknowledged that he was subsequently re-arrested, charged, and convicted of DUI, and had since been released. He provided the court with a certificate of attendance from Buffalo Valley, stating that he successfully completed the program. He also provided the court with a certificate of attendance from Narcotics Anonymous. He said he recently had foot surgery and asked the physician to prescribe a non-narcotic drug for any pain due to his commitment to sobriety. However, he said the pain became increasingly worse, he "ended up getting some drugs," and he had another relapse. He was arrested again when he missed a court date and tested positive on a drug screen. At this point, the record shows defense counsel requested the court to move the most recent "batch" of medical records into evidence, and they were admitted as an exhibit.

The Defendant continued to testify concerning his accomplishments while in custody and provided the court with certificates for successful completion of alcohol and drug treatment from New Avenues, which were admitted as exhibits. If released, the Defendant intended to participate in the DDS program because it would help him manage his mental health and drug issues. He believed this program had structure that previous programs did not. He also stated that he was willing to accept treatment now, unlike before, and that his mindset had changed. Letters of acceptance from Restoration House and Buffalo Valley were admitted into evidence and received by the court. The Defendant believed this request for alternative sentencing was different than his previous attempts at probation because being shot had changed him, he did not want to do drugs anymore, he realized he had to find more tools to utilize when things happened, and he wanted his mother to know he was trying to get better.

On cross-examination, the Defendant conceded that he had an extensive criminal history consisting of 14 prior felonies, 14 misdemeanor thefts, 11 failures to appear in court, and 15 probation violations. The Defendant repeated that he did not remember being inside the victim's home on the night of the offense. He agreed the longest period of sobriety he had was 18 months. The Defendant agreed that he did not have a consistent work history and that he had committed crimes, such as stealing, to support his drug habit. He agreed that the proposed Buffalo Valley treatment plan would be his second time receiving treatment at that facility. He further agreed that he had participated in five or six prior court ordered drug treatment programs, but he had done so for reasons other than himself.

At the conclusion of the proof, the State argued that confinement was appropriate based on all three statutory factors under the Sentencing Act. The Defendant argued

- 6 -

generally "that he be sentenced to Community Corrections so that he can be supervised by DDS and continue building his coping skills, give back to the community and show remorse for what he did" in this case.

During argument, defense counsel urged the court to apply mitigating factor (13), the catchall mitigating factor under the Sentencing Act, to reduce the Defendant's sentence. In response, the trial court stated that the Defendant "already had his sentence mitigated by receiving the lowest possible sentence he can have given his criminal record." Defense counsel agreed, and the court continued, "I mean he has received a significant benefit because the Court has accepted the [ten]-year sentence that the parties in this case have agreed to." Defense counsel again agreed and noted that the resolution of this case permitted the Defendant to plead as a Range III offender instead of as a career offender. Defense counsel then asked the court to take the matter under advisement to review the Defendant's "medical records and accomplishments."

In determining the manner of service for the Defendant's ten-year sentence, the trial court stated:

> So I have had an opportunity to hear [the Defendant's] testimony today about his medical care and the -- his experience in the hospital as a result of this incident.
>
> So it is -- and I have also reviewed carefully before this hearing the presentence investigation report and the case file. So I am very familiar with the circumstances of the offense, [the Defendant's] criminal history, and I listened carefully to the testimony today. So it is unnecessary for the Court to take the matter under advisement because I think I have got everything I need to make a decision in the case.
>
> And I mean, it's unfortunate -- I mean, this whole situation is -- obviously, for the victims in this case, must have been absolutely terrifying. And I can't stress enough the -- the weight that the Court places on the consideration under 40-35-103(1) (B), that confinement is necessary to avoid depreciating the seriousness of the offense.
>
> This was a burglary of a residence that was occupied by a parent and a very, very young child that, you know, again, was exceptionally serious. So that factor, I think you know, carries great weight.

[The Defendant's] criminal history is self-evident from the presentence report. And he is asking today for a 10-year probationary sentence.

[The Defendant] has not -- I mean, I have gone through his criminal history. He has not had even close to 10 years in his adult life in which he has not been convicted of some crime.

The longest period -- the longest consecutive period of years in his life in which he was not committing crimes in this community was a period when -- were the periods when he was incarcerated and restrained.

And that is actually -- and that's just the convictions. I mean, my -- and obviously, listening to [the Defendant] describe his life and his activities suggest to me that there may have been some other criminal activity. But I can only go by the convictions and that is what I am going by.

The very purpose of criminal sentencing is to restrain defendants with a long history of criminal conduct whose criminal conduct and criminal history demonstrates a disregard for the rules of law, and in this case, a complete and utter failure of multiple, multiple efforts of rehabilitation.

He has never succeeded on probation. Multiple periods of incarceration have not prevented additional criminal activity.

And really, you know, I agree with General Ewald, that all three of the considerations under 40-35-103 for a sentence of incarceration are more than satisfied. Any one would suffice, but all of them have been met in this case, and there really is just no justification.

Seven prior burglaries. This is an aggravated burglary. He had seven prior burglaries before this case. Multiple other -- and those are just the felonies. Multiple other theft offenses and many, many, many other misdemeanor criminal offenses.

[The Defendant] has been victimizing this community by committing criminal acts for his entire adult life, and incarceration is necessary in this situation to protect this community. So this will be a sentence to serve.

It is from this order that the Defendant now appeals.

## ANALYSIS

The Defendant contends he is entitled to de novo review or a remand for a new sentencing hearing because the trial court failed to consider three statutory sentencing factors in rejecting his request for an alternative sentence. First, the Defendant asserts that at the conclusion of the sentencing hearing, he requested the trial court to take the case under advisement to consider several of the exhibits admitted during the sentencing hearing, including his medical records, certificates of attendance and completion, and his anticipated rehabilitation plan. Because the trial court declined to take the matter under advisement, the Defendant argues the court failed to consider "the evidence received at the trial and the sentencing hearing." See Tenn. Code Ann. § 40-35-210(b)(1). Next, the Defendant argues the court failed to consider the principles of sentencing and arguments as to sentencing alternatives, see id. § 40-35-210(b)(3), by construing the statute narrowly and failing to understand he was requesting a community corrections sentence. Finally, the Defendant asserts that the trial court failed to consider any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee. See id. § 40-35-210(b)(6). In response, the State contends the trial court made the requisite findings before it properly exercised its discretion and ordered the defendant to serve his sentence in confinement.

A trial court's sentencing decisions are reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015) (citations omitted) (internal quotation marks omitted).

Trial courts are instructed to consider the following factors when sentencing a defendant:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

- 9 -

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

In determining whether to deny probation and impose a sentence involving confinement, the trial court should consider the criteria set forth in Tennessee Code Annotated section 40-35-103(1)(A-C) which provides that confinement of an offender is necessary under the following conditions:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Id. A defendant bears the burden of establishing his or her suitability for probation. See State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-303(b)). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" Carter, 254 S.W.3d at 347 (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). Finally, the sentence imposed should be no greater than that deserved for the offense committed, and the sentence should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103 (2), (4).

In support of de novo review or a remand for resentencing, the Defendant first argues that the trial court failed to consider a photograph of a scar on the Defendant's stomach, the Defendant's medical records summarizing his post-surgery discharge, various program certificates, emails confirming the Defendant's attendance at various programs, medical appointment summary notes showing a bullet was removed from the Defendant's foot, the Defendant's completed courses and certificates while incarcerated, and acceptance letters from Buffalo Valley and Cross Bridge concerning the Defendant's anticipated treatment program. Our review of the record shows that the trial court reviewed these exhibits as they were admitted during the sentencing hearing. The fact that the trial court declined to take the matter under advisement does not mean that the trial court did

not consider the evidence for its submitted purpose. Moreover, the Defendant does not point this court to anything in the exhibits that was not testified to during the sentencing hearing or included in the presentence report to establish his suitability for probation or community corrections. Accordingly, this is not grounds for de novo review and a remand for a new sentencing hearing is unnecessary because the trial court properly considered the evidence received at the sentencing hearing.

Next, the Defendant argues that he is entitled to de novo review or a remand for resentencing because the trial court's view of the sentencing principles was "too narrow" and the court failed to understand that the Defendant was requesting a community corrections sentence. The record shows that the Defendant did not file a pre-sentence motion with the trial court requesting a sentence under the Community Corrections Act. See Tenn. Code Ann. §§ 40-36-101 to -106 At the sentencing hearing and after the proof had been concluded, defense counsel stated in a single sentence during closing argument "that [the Defendant] be sentenced to Community Corrections so that he can be supervised by DDS[.]" At no point during the sentencing hearing did the Defendant advance the arguments under the community corrections act that he now advances on appeal. In failing to clearly assert that he was requesting a sentence under the community corrections act, the trial court was not obligated to sua sponte review his sentence under the act. See State v. Nance, No. W2019-01566-CCA-R3-CD, 2021 WL 1699316, at *4-5 (Tenn. Crim. App. Jan. 27, 2021) (recognizing that trial court is not required to sua sponte review a defendant's eligibility for community corrections apart from probation in sentencing a defendant). The Defendant has run perilously close to waiver of this issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

In the present case, as discussed, the trial court found that confinement of the Defendant was necessary based upon the Defendant's extensive history of criminal conduct, to avoid depreciating the seriousness of the offense, and due to the failure of less restrictive measures of punishment. The Defendant seemingly does not contest the trial court's determination that he was not entitled to probation, and we discern no abuse of discretion in the trial court's denial of probation. Nance, 2021 WL 1699316, at *4 (collection of cases upholding trial court's findings in denying probation and noting that the findings apply with equal force to denial of community corrections). We nevertheless acknowledge the Defendant's contention that the trial court failed to consider eligibility requirements for a sentence of community corrections, and upon de novo review, we conclude that the Defendant has failed to establish his suitability for an alternative sentence under the Community Corrections Act. State v. Grigsby, 957 S.W.2d 541, 545-46 (Tenn. Crim. App. 1997).

A sentence under the Community Corrections Act is an alternative sentence, and we must first determine whether the Defendant is a suitable candidate for alternative sentencing. In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration. Tenn. Code Ann. § 40-35-102(5). A defendant who does not fall within the parameters of subdivision (5), and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary; however, a defendant's prior convictions shall be considered evidence to the contrary and, therefore, a defendant who is being sentenced for a third or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing. Id. § 40-35-102(6)(A).

The Defendant, a career offender, received an agreed upon Range III ten-year sentence to be served at a release eligibility of 45%. Moreover, the Defendant has a criminal history evincing a clear disregard for the laws of society, and, because the present offense was committed while he was on probation, a failure of past efforts at rehabilitation. Based on the Defendant's prior criminal history and the fact that he is being sentenced for a third or subsequent felony conviction involving separate periods of confinement, we conclude that he is not a favorable candidate for alternative sentencing. The Defendant nevertheless argues that the trial court abused its discretion in denying a community corrections sentence.

The purpose of the Community Corrections Act was to "[r]educe the number of felony offenders committed to state penal institutions, local jails, and workhouses for whom a treatment-centered pathway and appropriate evidence-based community supervision will result in less recidivism and more effective outcomes." Tenn. Code Ann. § 40-36-103(3). Eligible offenders under the Community Corrections Act include:

(A) Persons who, without this option, would be incarcerated in a correctional institution;

(B) Persons who are convicted of property-related, or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence;

(F) Persons who do not demonstrate a pattern of committing violent offenses[.]

Id. § 40-36-106(a)(1)(A)-(F). Simply because an offender meets the minimum requirements under the Community Corrections Act "does not mean that he is entitled to be sentenced under the Act as a matter of law or right." State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998) (citing State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987)). Instead, the Act's criteria "shall be interpreted as minimum state standards, guiding the determination of eligibility of offenders under this chapter." Tenn. Code Ann. § 40-36-106(d). This Court has previously noted that a defendant's rehabilitative potential is central to the process of selecting those offenders to place in Community Corrections. Grigsby, 957 S.W.2d at 547. It remains a defendant's burden to demonstrate that the sentence of total confinement imposed by the trial court is improper. Id. at 544; see also Sentencing Comm'n Cmts., Tenn. Code Ann. § 40-35-401.

Upon our de novo review, we conclude that the Defendant is not entitled to a sentence of community corrections. Based on the presentence report and the Defendant's testimony, the Defendant previously had spent time in several drug rehabilitation programs which proved unsuccessful and demonstrated that past efforts to rehabilitate the Defendant had failed. Significantly, the Defendant was on probation at the time of the instant offense. See State v. McKinney, No. W2001-01832-CCA-R3-CD, 2002 WL 925250, at *4 (Tenn. Crim. App. May 8, 2002). Over the past three decades, the Defendant has amassed an enormous criminal history consisting of over 14 felony convictions, 78 misdemeanor convictions, and several other older convictions that had been dismissed or retired. He agreed that he committed crimes in order to finance his drug addiction and that his longest period of sobriety was 18 months. This was evidenced by the fact that the Defendant at age 53 had no verifiable work history. In so much as the Defendant suggests that he is eligible for the special needs provision of the act, see Tenn. Code Ann. § 40-36-106(c), we conclude that the Defendant has failed to establish that "the treatment of the special need could be best served in the community rather than in a correctional institution." See State v. Ware, No. E2013-02545-CCA-R3-CD, 2014 WL 2547783, at *3-5 (Tenn. Crim. App. June 4, 2014). Moreover, because the Defendant has failed to establish his suitability to a community corrections sentence, we conclude that he is not entitled to relief.

Finally, the Defendant argues that he is entitled to de novo review or a remand for resentencing because the trial court failed to consider any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee. See Tenn. Code Ann. § 40-35-210(b) (requiring trial court to consider [a]ny statistical information provided by the [AOC] as to sentencing practices for similar offenses in Tennessee). As to this issue, we acknowledge that the sentencing statute requires the trial court to consider the AOC statistical information as part of its sentencing determination and that it was error for the trial court not to do so. See State v. Richmond, No. M2021-01025-CCA-R3-CD, 2022 WL 4372220, at *13-14 (Tenn. Crim. App. Sept. 22, 2022) (concluding trial court erred in declining to review AOC statistics and stating that it could not access website and that it had reservations about statistics). However, the Defendant did not raise the question of the AOC statistics at sentencing, nor did he argue the relevance of the AOC statistical information to the trial court. See e.g., State v. Earley, 719 S.W.3d 228, 255 (Tenn. Crim. App. 2025) (analyzing Defendant's excessive sentence claim based on application of AOC statistics). Indeed, in this appeal, the Defendant again does not cite the applicable AOC statistical information, and he fails to argue whether his sentence was disproportionate to other similarly situated offenders in Tennessee. We note that any omission of the trial court's consideration, or lack thereof, of applicable statistical information does not overcome the presumption of reasonableness afforded the trial court's within-range sentence. State v. McDowell, No. W2015-01762-CCA-R3-CD, 2016 WL 4147047, at *5 (Tenn. Crim. App. Aug. 2, 2016) (citing Bise at 705-06). Moreover, although a trial court must consider factors consistent with the purposes and principles of sentencing, statistical information is rarely relevant where there is an agreed-upon and knowing plea for a length of sentence. See Tenn. Code Ann. § 40-35-210; State v. Albanese, No. E2024-00744-CCA-R3-CD, 2025 WL 1165895, at *5 (Tenn. Crim. App. Apr. 22, 2025). Because the Defendant has failed to demonstrate that his sentence of confinement was disproportionate with other Tennessee offenders convicted of aggravated burglary, he is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we affirm the judgment of the trial court.

s/ Camille R. McMullen

CAMILLE R. MCMULLEN, JUDGE